FILED

OCT 1 2 2012

STEPHEN C. WILLIAMS
U.S. MAGISTRATE JUDGE
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF ILLINOIS

| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED TO CALL NUMBER **314-546-████** | Case No. 12-mj-7080 **Filed Under Seal** |
| --- | --- |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, **MARK R. RANCK,** being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(314) 546-████** (the "**TARGET TELEPHONE**"), whose service provider is Sprint, a wireless telephone service provider headquartered at Overland Park, Kansas. The subscriber of the **TARGET TELEPHONE** is unknown. The **TARGET TELEPHONE** is further described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I am a Special Agent (SA) with the Federal Bureau of Investigation, Springfield Division, and have been a SA for 23 years. I am currently assigned to investigate Civil Rights allegations which include those involving Human Trafficking.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, Sources of Information (referred to as SOI's), and law enforcement officers. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1589-1591 and 2421 (the "TARGET OFFENSES") have been committed, are being committed, and will be committed using the **TARGET TELEPHONE** number **314-546-[REDACTED]**, with service provided by Sprint. There is also probable cause to believe that the location information described in this affidavit will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

5. For the reasons set out in this affidavit, there is probable cause to believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed using the **TARGET TELEPHONE.** Based on the investigation to date, the **TARGET TELEPHONE** is known to be used by [REDACTED].

6. This application is submitted in connection with a human trafficking investigation targeting [REDACTED] and others yet unknown. Based on the investigation to date, and as set out below, your affiant states that there is probable cause to believe that signaling information, including cell site information, precision location information, and factory installed GPS information will lead to evidence of the aforementioned criminal offenses, the location of [REDACTED] and [REDACTED] as well as to the identification of other unidentified individuals who are engaged in the commission of those criminal offense and related crimes.

7. On February 26, 2012, SOI 1 was arrested by the Washington Park, Illinois Police Department on an outstanding retail theft warrant from Madison County, Illinois. Upon being

taken to the police station, SOI 1 told the officer she needed to get her medication, her link card and her purse from the residence in which she was staying, [REDACTED] East St. Louis, Illinois. Since this initial report, investigation has revealed the residence in question is actually located at [REDACTED], East St. Louis, Illinois.

8. SOI 1 used a cellular telephone that she said had been given to her by [REDACTED] to call [REDACTED] and ask him to bring her medication, link card, and purse to the police station. [REDACTED] refused to do so and hung up on SOI 1. SOI 1 attempted to call [REDACTED] again using the same cellular telephone but the call did not connect. Washington Park Police Officer James Boyd went to [REDACTED]. Once there, Officer Boyd saw security cameras on the exterior of the home and motion sensor lighting. [REDACTED] answered the front door of the residence and agreed to bring SOI 1's medications, link card, and purse to Officer Boyd. Officer Boyd also encountered another female at the residence, later identified as [REDACTED]. Washington Park Police Officer Bond accompanied Officer Boyd to the residence. The officers wanted to fully identify [REDACTED] who told the officers she was from [REDACTED] and was working at a strip club in Brooklyn, Illinois. Officers took her back to the police station for further questioning. [REDACTED] advised [REDACTED] was her "man" and she had been with him for about 4 years. [REDACTED] said she was not being held against her will and was not being made to do things she did not want to do.

9. [REDACTED] arrived at the police station a short time later and demanded to know why his "woman" was taken into custody. He was told she was at the police station in order to fully identify her and to determine if she was being held against her will and to determine her immigrant status. Officer Boyd told [REDACTED] to bring [REDACTED] identification or green card to the

station. left and returned to the police station approximately 30 minutes later with valid resident alien card and an Iowa identification card. was released.

10. According to permanent resident card, she is fully identified as with a date of birth of and her Country of Birth is .

11. SOI 1 was interviewed by the FBI shortly after her arrest. This affiant has interviewed SOI 1 three times regarding the details of her interaction with and has found her to be consistent throughout all of the interviews. Additionally, many of the details of SOI 1's statement has been corroborated by independent investigation as outlined below.

12. SOI 1 stated that approximately three weeks before being arrested on the Macoupin County warrant, saw SOI 1 walking on the streets in the East St. Louis area. He pulled up to her while driving a Mercedes Benz. told her he would take care of her and that she could dance to make money. told her they could be a family since he didn't have any family around. SOI 1 agreed to live with . When she arrived at she met who was also living at the residence. SOI 1 stated that goes by the name of talked to SOI 1 about the escort business which SOI 1 knew to be prostitution. SOI 1 stated that made her watch movies about how pimping worked and talked about tattooing his name on her, which he never did. also told SOI 1 he had other females working for him at the strip clubs in the Washington Park, Illinois area. Consistent with this statement, during the course of this investigation a MySpace.com account was identified for On that MySpace.com account agents identified a video posted on page in which is talking to the camera about being a pimp and making derogatory statements about any prostitute who does not work with a

pimp. told SOI 1 about his criminal history including statements that he has been involved in drugs, guns and that he shot someone in Illinois. This affiant made contact with the Police Department and investigators informed this affiant their records indicated that in 1998 was involved in a shooting.

13. SOI 1 stated that during the three weeks she was at the residence, did not let her or out of the house alone. She said that he drove them to and from strip clubs in Washington Park and Brooklyn almost daily to "work." SOI 1 said that she danced at Blondie's, , Washington Park, Illinois, and danced at Roxy's, , Brooklyn, Illinois. SOI 1 said the shifts for her and started around 7:00 p.m. and ended between 2:30 a.m. and 4:30 a.m. During the investigation, SOI 1 stated that she would go to Blondie's to strip but that most of her time there was spent in the "backroom" where she engaged in acts of prostitution throughout the night. SOI 1 stated that it was her understanding and belief that was doing the same thing at Roxy's. SOI 1 said that she was given a cellular phone by and that he told her the phones were only for "you and me." SOI 1 said had two cellular telephones for himself and he programmed his two numbers into SOI 1's telephone under the heading "Daddy1" and "Daddy2". From investigative experience, I have learned it is common practice for a pimp to be known as "daddy" to prostitutes who are working for the pimp. Consistent with this statement by SOI 1 it should be noted that when SOI 1 was arrested by Washington Park Police Officer Boyd, she had the cellular telephone that she said had given her. In that cellular telephone two of the telephone numbers programmed in were under the headings "Daddy1" and "Daddy2." Subpoenas have been obtained for those two telephone numbers. One of the telephone numbers returned as registered to . The other telephone number returned as registered to a different name,

but with the address of [redacted], East St. Louis. Another number programmed into the phone given by [redacted] to SOI 1 was 314-546-[redacted] under the heading [redacted]. SOI 1 said that she and [redacted] were made to give [redacted] all the money they earned during their shifts at the respective strip clubs. [redacted] told them to organize the currency by denomination in a stack and give him the money when he picked them up after their shifts. [redacted] would drive them to the store if they needed personal hygiene items, give them money only for those items and wait in the car outside. [redacted] told SOI 1 and [redacted] not to look at other men during their time away from the residence or he would hurt them. SOI 1 said [redacted] never hit her and she never saw him hit [redacted] but he threatened to do so several times if they didn't "act right." SOI 1 stated that [redacted] has security cameras installed at his residence with several monitors. She stated that when the front or back door is opened, the security system plays a recording stating "front door open" or "back door open." As noted above, Officer Boyd observed security cameras mounted on the outside of the residence when he made contact with [redacted] at the beginning of this investigation. Additionally, photographs of the residence have been taken which depict the security cameras mounted near the front door and elsewhere on the residence.

14. Through surveillance conducted at [redacted] since March 2012, it has been determined that [redacted] routinely leaves the residence between 6:00 p.m. and 7:00 p.m. with [redacted]. [redacted] returns to the residence anywhere from one to three hours later without [redacted] [redacted] then leaves the residence between 1:00 a.m. and 4:00 a.m. and returns within the hour with [redacted]. This pattern is almost daily with the exception of at least three times during which it is believed that [redacted] and [redacted] left the state for several days as described below.

15. Throughout this investigation, [redacted] has predominantly used two vehicles, a black 2002 Jaguar, Illinois license number [redacted], and a 1995 tan Mercedes Benz, Illinois license number [redacted] On June 3, 2012, at approximately 6:30 p.m., [redacted] and [redacted] left the residence in the Jaguar and [redacted] returned by himself approximately 30 minutes later. On June 4, 2012, at approximately 1:37 a.m, [redacted] was observed loading items, including what appeared to be a suitcase, into the Jaguar then driving away from the residence in the Jaguar. This follows the pattern previously mentioned. [redacted] and the Jaguar were not seen again at [redacted] until June 7, 2012 at approximately 5:31 p.m. At that time, [redacted], [redacted], and an unknown female arrived back at the residence in the Jaguar. Thereafter, the pattern previously mentioned begins. Throughout this investigation, except for very few instances, [redacted] has not been seen coming to or leaving from the residence at [redacted] Street without [redacted] present with her.

16. On June 6, 2012, the license plate for the Jaguar was inquired upon by the Polk County Sheriff's Department, Des Moines, Iowa. The deputy who ran the license plate was contacted. He and his partner were patrolling an area of strip clubs in Des Moines and came upon the Jaguar. He stated that from his experience, he sometimes can find individuals who are wanted on out of state warrants by running out of state plates. The driver of the Jaguar was not committing any traffic violation so no stop was initiated but it was seen in the parking lot of a strip club in Des Moines, Iowa.

17. On June 9, 2012, Washington Park Police Officer James Boyd conducted a traffic stop on the Jaguar for improper tinting on the windows. [redacted] was the driver of the vehicle and with him was a female. [redacted] provided Officer Boyd with his license, registration, and

proof of insurance as requested. Officer Boyd instructed to ask the female passenger for her identification. At that time opened his wallet in view of Officer Boyd and pulled from his wallet an Iowa identification card for from Des Moines, Iowa. Officer Boyd confirmed from looking at this was the passenger in the Jaguar with . Officer Boyd walked to the passenger side of the vehicle to speak with . Officer Boyd asked to step out of the car at which time turned to and asked him if it was "ok" for her to exit the vehicle. Officer Boyd could not hear response but did get out and spoke to Officer Boyd. told Officer Boyd she was not being held against her will and wasn't being forced to do anything against her will. Officer Boyd issued two traffic citations and ended the contact. From training I have received relating to Human Trafficking, which also can involve prostitution, I have learned it is common for identification documents to be held by those in control of the victims. It is also common for victims to respond to questions from law enforcement in such a way as to give the impression they are engaging in activities of their own will, especially when the person in control is within earshot of the conversation.

18. Based upon the information presented in paragraphs 15 through 17, this affiant believes was brought back to Washington Park, Illinois by from Des Moines, Iowa. Subsequent investigation determined was released from the Iowa Correctional Institute for Women, Mitchellville, Iowa, on April 30, 2012.

19. has been seen by agents inside Roxy's on three occasions. The first time, on June 26, 2012, agents saw come into the establishment at approximately 6:40 p.m. and walk straight to the enclosed private area in the back of the club. Agents did not see her come

out of that area until approximately 9:40 p.m. at which time she danced on stage, which included her taking her clothes off. When she was finished dancing she went back into the enclosed private area. This activity as well as the pattern established through surveillance is consistent with the information provided by SOI 1 that [redacted] would drive the two women daily to their respective strip clubs to "work" their shift during which most of their time would be spent in the back room and not on stage dancing.

The second occasion occurred on September 20, 2012. An agent entered Roxy's in order to establish rapport with [redacted] and attempt to obtain information from her about her situation. [redacted] shared with the agent she was from [redacted] and lived in Washington Park, Illinois with her boyfriend who was a truck driver. She said she has to work seven days a week in order to make money. When asked by the agent if [redacted] was happy, she paused and then said it was complicated. [redacted] asked the agent if he wanted to go into the "VIP" room within Roxy's. She said the cost was $500 for an hour and $250 for a half hour and that the club gets some of the money. The agent declined the offer. [redacted] told the agent private dances can be given in a different room and are $40 for one song and $100 for three songs. [redacted] said she can be topless during a private dance but there were no rules in the VIP room. In order to maintain the cover and to keep [redacted] interested, the agent received two private dances from [redacted]. The agent bought several drinks for [redacted] at her request and her favorite drink is called a [redacted].

The third visit inside Roxy's occurred on September 23, 2012. The agent again made contact with [redacted]. [redacted] told the agent she and her boyfriend would be leaving tomorrow for two or three weeks to visit family in Iowa. [redacted] again asked if the agent wanted to go to the VIP room and if the agent wanted a private dance. The offers were declined but the agent gave

[REDACTED] the money she would normally charge for a private dance. At one point during the evening, [REDACTED] told the agent she was going to smoke some weed at the DJ booth. [REDACTED] left and returned ten to fifteen minutes later. The agent observed several females going into the VIP room with male customers of the club. The agent heard announcements over the club's public address system indicating the customer's time was up. [REDACTED] became emotional when she told the agent her brother was in the process of being deported. She shared photographs of her family with the agent. [REDACTED] left the agent briefly and when she returned, she said she called her boyfriend when she became upset but he didn't want to talk about it with her, wanting to wait until she got home. [REDACTED] told the agent her life was a mess and maybe she just needs a "sugar daddy." Before leaving the club, [REDACTED] gave the agent her telephone number and said he could call her anytime. The number she gave him was 314-546-[REDACTED]. During the visits inside Roxy's, agents confirmed [REDACTED] stage name inside Roxy's is [REDACTED]. Throughout this investigation, agents have never observed a truck of any make or model parked at [REDACTED], East St. Louis, Illinois, the residence of [REDACTED] and [REDACTED].

20. On September 24, 2012, surveillance at [REDACTED], East St. Louis, Illinois established [REDACTED] made several trips from the residence to the 1995 Mercedes Benz parked in the driveway. It appeared he was loading bags and a suitcase or two. At approximately 1:22 p.m. on that date, [REDACTED] and [REDACTED] entered the Mercedes and drove from the residence. Pursuant to a search warrant previously obtained in this District on August 30, 2012, for this investigation, a GPS tracking device was placed on the Mercedes. The battery on this tracking device died a few days prior to September 24, 2012. Agents were not able to get access to the device in order to install a new battery prior to [REDACTED] and [REDACTED] leaving the area. Attempts have been made in the Des Moines, Iowa area to locate the Mercedes near addresses previously

associated with [redacted] and [redacted] without success. According to the Bureau of Immigration and Customs Enforcement, [redacted] visited her brother in jail in Council Bluffs, Iowa on September 27, 2012. This is the brother who is under deportation orders. [redacted] and [redacted] whereabouts are currently unknown.

21. Text messages were sent to 314-546-[redacted] on September 24, 2012, by the agent who met with [redacted] on September 20, 2012. Text responses were received. This same agent sent text messages to 314-546-[redacted] on September 25 and October 2, 2012. No response has been received.

22. As noted above, during the course of this investigation a MySpace.com account was identified for [redacted]. On that MySpace account, agents also observed a photograph of [redacted] and [redacted] with the phrase [redacted] below the photograph. Through training and investigation, I have learned that the term "bottom bitch" is a term used in the sex trade to designate a "pimp's" number one girl, who is often the most profitable and usually the most loyal.

23. The license plate of the Jaguar has been inquired upon by other law enforcement agencies since March 2012 to include Rolla, Missouri Police Department and Tulsa, Oklahoma Police Department.

24. Since leaving East St. Louis, Illinois on September 24, 2012, comments have been made to [redacted] Facebook account. The comments relate to her soon to be deported brother and the fact that she will miss him very much. The most recent comment was posted on October 7, 2012. This posting indicates it was made from a mobile telephone. The agent to

whom [redacted] gave her mobile telephone number sent a text message to 314-546-[redacted] on October 10, 2012. The agent received a text response from that number, stating that [redacted] was still in Iowa and did not know when she was coming back to East St. Louis, Illinois.

25. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

26. Based on my training and experience, I know that Sprint can collect E-911 Phase II data about the location of the **TARGET TELEPHONE**, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on Sprint's network or with such other reference points as may be reasonably available. Based on my training and experience, I know that Sprint can collect cell- site data about the **TARGET TELEPHONE.**

## AUTHORIZATION REQUEST

27. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

28. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

29. I further request that the Court direct Sprint to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Sprint. I also request that the Court direct Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **TARGET**

**TELEPHONE** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

30. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET TELEPHONE** outside of daytime hours.

31. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully Submitted,

MARK R. RANCK
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on October 12TH, 2012.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF ILLINOIS

## ATTACHMENT A

**Property to Be Searched**

1. The cellular telephone assigned call number ***(314) 546-█***, (the **"TARGET TELEPHONE")**, whose wireless service provider is Sprint a company headquartered at Overland Park, Kansas. The subscriber of the **TARGET TELEPHONE** is unknown.

2. Information about the location of the **TARGET TELEPHONE** that is within the possession, custody, or control of Sprint, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

**ATTACHMENT B**

**Particular Things to be Seized**

All information about the location of the **TARGET TELEPHONE** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the **TARGET TELEPHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).